NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANDY ALMANZAR,<br><br>      Plaintiff,<br><br>v.<br><br>C&C METAL PRODUCTS, INC., et al,<br><br>      Defendants.<br>_____<br><br>RACINE FEDERATED, INC.,<br><br>      Defendant/Third Party Plaintiff,<br><br>v.<br><br>AVNET, INC.,<br><br>      Third Party Defendant. | Civil Action No.: 07-4002 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

     This matter comes before the Court on a motion for summary judgment filed by Defendant Racine Federated, Inc. ("Racine"), a motion for summary judgment filed by Third Party Defendant Avnet, Inc. ("Avnet"), a motion for summary judgment by Defendant C&C Metal Products, Inc. ("C&C"), and a motion for summary judgment filed by Defendant Machinery Services Corporation ("MSC"). Plaintiff's Amended Complaint brings claims against the defendants related to a workplace accident that occurred on April 10, 2006. The Court has considered the submissions in support of and in opposition to the motions and decides the matter

without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons discussed below, Racine's motion is granted, Avnet's motion is granted, C&C's motion is denied, and MSC's motion is denied.

## I. BACKGROUND

Mr. Almanzar began working for C&C in November of 2004 operating "tumbler" machines. (C&C's Stmt. of Mat'l Facts Pursuant to L. Civ. R. 56.1 [hereinafter "C&C's Fact Stmt."] ¶ 6.) Several months later, he "began to learn how to operate the die casting machines." (Id., at ¶¶ 6-7.) The die casting machines

> operate[] by hydraulically pressing together two "dies" which have the shape of a part molded into them. Once the dies are "closed" together, hot molten zinc is injected into the mold. The dies are then retracted and a completed zinc part drops from the dies.

(Id., at ¶ 3.) A die casting machine has "a sliding door on the front of it that allows the operator to access the area of the dies." (Id., at ¶ 8.) When the door is opened, a "'limit' switch on it . . . stops the machine's cycle." (Id.) The die casting machine's cycle may also be stopped by pressing a red stop button on the electrical control panel. (Id., at ¶ 9.) The red stop button is larger than the other buttons and stops all the machine's systems. (Id.) Unlike the red stop button, the limit switch on the sliding safety door "does not cause all of the machine's systems to shut down." (Pl.'s Responsive Stmt. of Mat'l Facts Pursuant to Rule 56.1 [hereinafter "Pl.'s Responsive Fact Stmt"] ¶ 8.) The front of the sliding door has the following warnings written in English: "DANGER-HAND HAZARD" and "TURN OFF POWER BEFORE REACHING IN." (C&C Fact Stmt. ¶ 10.)

Periodically, during the automatic operation of the die casting machines, the completed

parts come out defective. (Id., at ¶ 13.) It is undisputed that "[w]hen [the] parts were coming out of the machine in a defective condition, [Mr. Almanzar] would slide open the yellow guard door" and "reach into the area of the open dies with a gloved hand to remove errant pieces of zinc from them." (Id., at ¶ 14.) "[Mr. Almanzar] testified that he would not press the red emergency stop button before putting his hand between the dies, but would instead rely on the limit switch on the yellow door to stop the cycle of the machine." (Id., at ¶ 15.) He asserts that "C&C operators are trained to never turn off the machine with the red button when performing the . . . die cleaning function" because pressing the red button "creates unacceptable production delays." (Pl.'s Responsive Fact Stmt. ¶ 15 (emphasis in original).) On the other hand, C&C asserts that die casting machine operators, like Mr. Almanzar, were trained to use the red stop button prior to opening the sliding safety door, and that the workers were told "to use a long handled brush to clean out the dies if necessary, not a gloved hand as [Mr. Almanzar] did." (C&C Fact Stmt. ¶¶ 7, 23, 24.) Mr. Almanzar and another worker, Pedro Marte, testified that "no brushes or implements of any description were provided to casting machine operators." (Pl.'s Responsive Fact Stmt. ¶ 24.)

   On April 10, 2006, "[m]achine number twelve's parts were coming out defective and [Mr. Almanzar] stopped the machine by sliding open the yellow door with his right hand and placed his left hand in the machine." (C&C Fact Stmt. ¶ 19.) It is undisputed that he did not use the red stop button, that he "heard the hydraulic pump stop when he opened the yellow door prior to placing his hand in the machine," and that "[a]fter he placed his hands between the dies he then heard the hydraulic pump unexpectedly restart and the dies came together on his hand." (Id., at ¶¶ 20-22). Mr. Almanzar sustained serious injury to his hand.

In 1994, "another C&C employee, Luis Santiago, was involved in an accident with a different die casting machine in which his right hand was injured." (Id., at ¶ 29.) The C&C accident report for this incident states: "Operator reached inside die area with an air blow gun in his right hand." (William A. Thomas Cert. in Opp'n [hereinafter "Thomas Cert."], Ex. F.) Mr. Almanzar asserts that the injury must have occurred in a similar fashion to his injury because "[t]here is no other way for an operator to get his hand into a [die] casting machine's die area" than to open the sliding safety door. (Pl.'s Responsive Fact Stmt. ¶ 29.)

Additionally, in 2000, Guadalupe Amaro, another C&C die casting operator, was injured in an accident almost identical to that of Mr. Almanzar. (See C&C Fact Stmt. ¶ 26.) Like Mr. Almanzar, "Mr. Amaro's hand was caught between the dies of machine #12." (Id.) Also like Mr. Almanzar, Mr. Amaro "failed to use the red emergency stop button before placing his hand in the machine." (Id.) After Mr. Amaro's accident, C&C asserts that it "retained an electrical control service company, Machinery Services Corporation, to examine and inspect the #12 machine." (Id., at ¶ 27.) The results of the examination were inconclusive, but C&C nevertheless put the machine back in service. (Id.; Pl.'s Responsive Fact Stmt. ¶ 27.) Contrary to C&C's allegations, MSC asserts that it did not perform the evaluation of or make repairs to Machine #12 in 2000. (Br. of Def. MSC in Supp. of Mot. for Summ. J. [hereinafter "MSC Br."], at 5.) However, MSC service technician John Simchera "testified that he first made service calls to C&C, though not to the die casting department, as early as 1999 or 2000, and that [MSC] was then an existing C&C client." (Pl.'s Br. in Opp'n to Def. MSC's Mot. for Summ. J., at 3.)

Although there were no additional accidents on Machine #12 between 2000 and 2006, Mr. Almanzar asserts that, "[i]n the weeks leading up to [his] April 10, 2006 injury, Machine 12

was breaking down three or four times per week requiring in-house service and repair by C&C's staff, and also requiring service by the outside contractor, [MSC]." (Pl.'s Responsive Fact Stmt. ¶ 28.) MSC asserts that the service calls were not repairs. (MSC Br., Fact Stmt. ¶ 6.) It is undisputed that there were numerous services calls by MSC to C&C between January 20, 2006, and April 10, 2006, the date of Mr. Almanzar's accident, and that the servicing of the die casting machines was done by Mr. Simchera, an unlicensed electrician. (Id.; Pl.'s Responsive Fact Stmt. ¶ 28; Thomas Cert., Ex. M, Dep. of John Simchera, Tr. 89:4-5.) Mr. Simchera's service notes from these visits are vague and incomplete, but he acknowledged that he performed work on C&C's die casting machines. (See Thomas Cert., Ex. M, Dep. of John Simchera, Tr. 62-75; id. at Ex. N, MSC Service Records.) The service descriptions include notations such as "replaced limit switch." (See, e.g., id., at Ex. N, Service Records, Slip Dated Feb. 21, 2006.) The service descriptions do not contain the number of the machine worked on, and Mr. Simchera could not recollect which machine related to each notation. (See id., at Ex. M, Dep. of John Simchera, Tr. 62-75.) But, he did acknowledge that work could have been performed on Machine #12. (See, e.g., id., at Tr. 75:11-13.)

  Subsequent to Mr. Almanzar's accident, on October 3, 2006, MSC sent Timothy Frohlich to examine Machine #12. (See id., at Ex. AA, MSC Service Records.) Unlike Mr. Simchera, Mr. Froelich is an electrician with a degree in electrical engineering. (See id., at Ex. CC, Dep. of Timothy Frohlich, Tr. 8:2-5.) He reported that Machine #12 was a "Big Mess" and "need[ed] to be completely rewired." (See id., at Ex. AA, MSC Service Records.)

  Mr. Almanzar's expert, Kathleen Hopkins, a licensed Certified Site Safety Manager, concluded that the "Direct, Indirect or Contributing, and Root Causes" of Mr. Almanzar's

accident were violations of various Occupational Safety and Health ("OSHA") Regulations. (See id., at Ex. I, Hopkins Report ¶¶ 1, 14-15, 17-32, 40.) For example, she opines that, in accordance with 29 C.F.R. § 1910.147, "[h]ad an effective Lockout/Tagout Program been enforced, [Mr. Almanzar] would have been provided proper preotection and [his] accident and injuries would not have occurred." (Id., at ¶ 15.) The OSHA regulations dealing with lockout/tagout requirements specify that employees should not place body parts in an industrial machine without the machine being appropriately shutdown. See 29 C.F.R.§ 1910.147; see also Thomas Cert., Ex. I. Dep. of Neal Liber (a C&C vice-president), Tr. 9:1-2, 187:14-18 (confirming that "[u]nder no circumstances are . . . employees . . . to put their hands inside [the die casting machines] without locking out and tagging out the machine").

In 1997, an OSHA inspection of C&C's facility resulted in two "Serious Violation" citations. (See Thomas Cert., Ex. G.) The citations were based on the OSHA inspectors' observations of the entire facility and were based, in part, on a failure to develop and implement adequate procedures "for locking or tagging out machines" in violation of 29 C.F.R. § 1910.147(c)(4)(i). (Id., at 1.) The inspector specifically noted, in the case of work done on a four-slide machine during a die setting process, that "[e]mployees had to place their hand into the point of operation to change the die . . . [and that their] hands could be caught in the point of operation, in the event of accidental startup of the machine." (Id.)

## II. LEGAL STANDARD

A court shall grant summary judgment under Rule 59(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## III.     RACINE'S MOTION FOR SUMMARY JUDGMENT

Mr. Almanzar's claims against Racine are premised on successor liability. (See Am. Compl. ¶ 5.) In general, "successor corporations are responsible for damages caused by defects in products manufactured and distributed by predecessors." Potwora ex rel. Gray v. Grip, 725 A.2d 697, 702 (N.J. Super. Ct. App. Div. 1999) (citing Ramirez v. Amsted Indus., Inc., 431 A.2d 811, 812 (N.J. 1981)). But, to be held liable as a successor, a corporation must "acquire[] the business assets and continue[] to manufacture essentially the same line of products as its predecessor." Ramirez, 431 A.2d at 825. The "[p]laintiff bears the burden of establishing that a party is a successor corporation within the meaning of Ramirez." Potwora, 725 A.2d at 707.

As this Court has previously found in this case:

> Avnet sold part of its business to National Die Casting ("National"); Racine subsequently purchased National. Avnet's sale to National did not include the H-35 product line. Thus, Racine never manufactured the H-35 machine.

(CM/ECF No. 63, at ¶ 3 (internal citations omitted).) It is undisputed that "Racine never

designed, manufactured, or continued the H-35 product and in fact never marketed or distributed any products under the Avnet name." (Br. of Def. Racine in Supp. of Its Mot. for Summ. J., Fact Stmt. ¶ 10.) Also, Mr. Almanzar has not opposed Racine's motion. Thus, Mr. Almanzar has not met his burden of establishing successor liability by Racine. Racine's motion for summary judgment is granted.

## IV.   AVNET'S MOTION FOR SUMMARY JUDGMENT

As this Court also has noted in a prior Order, Mr. Almanzar does not bring any claims directly against Avnet. (See CM/ECF No. 63, at ¶ 1.) Avnet is a third party defendant brought into this matter solely by the third party claims of Racine. In the event that it is found to be liable for any of Mr. Almanzar's alleged injuries, Racine brings claims against Avnet based on joint tortfeasor and indemnity theories. Mr. Almanzar also has not opposed Avnet's motion.

As this Court has dismissed Mr. Almanzar's claims against Racine, Racine's third party claims against Avnet based on such derivative theories of liability also are dismissed. Therefore, Avnet's motion for summary judgment is also granted.[1]

---

[1] After the due date for opposition briefing, Mr. Almanzar submitted a letter which confirmed that he was not opposing Avnet's summary judgment motion but requesting that Avnet's claims be dismissed without prejudice due to a pending state court action. This Court must decide the present motion on the pleadings, record, and briefing before this Court. This Court has previously dismissed on the merits many of the claims against Avnet. In dismissing the manufacturing defect claim, this Court noted that "no allegations have been made and no evidence has been presented that a defect . . . existed while the machine was in Avnet's control." (CM/ECF No. 63, at ¶ 8.) Additionally, there is no evidence before this Court to support a failure to warn theory. That Mr. Almanzar chose to split his claims and not bring claims directly against Avnet before this Court does not alter this Court's responsibilities once Avnet was made a party to this case and a motion for its dismissal was filed. On the record before this Court, summary judgment in favor of Avnet is appropriate, and the dismissal of Racine's third-party claims against Avnet is appropriately with prejudice.

### V.    C&C'S MOTION FOR SUMMARY JUDGMENT

C&C argues that the claims against it are barred by the New Jersey Workers Compensation Act ("WCA").  The New Jersey Supreme Court has held that the WCA "provides the exclusive remedy for claims against an employer when a worker is injured on the job, except for those injuries that have resulted from the employer's 'intentional wrong.'"  Mull v. Zeta Consumer Prods., 823 A.2d 782, 783 (N.J. 2003) (citing N.J.S.A. 34:15-8).  The WCA provides:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

N.J. Stat. Ann. § 34:15-8.  C&C argues that "it is clear that [Mr. Almanzar's] claims against C&C amount to nothing more than claims of negligence or at most gross negligence, and [that] he cannot meet the intentional wrong exception to the [WCA's] immunity."  (Br. of Def. C&C in Supp. of Mot. for Summ. J. [hereinafter "C&C Br."], at 6.)

In Laidlow v. Hariton Machinery Company, Inc., the New Jersey Supreme Court reiterated that "when an employee sues an employer for an intentional tort and the employer moves for summary judgment based on the Workers' Compensation bar, the trial court must make two separate inquiries:" (1) "whether, when viewed in a light most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury,"–the conduct prong, and (2) "whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar"–the context prong.  790 A.2d 884, 898 (N.J. 2002).

"Resolving whether the context prong is met is solely a judicial function." Id. But, where there are disputed issues of fact regarding the employer's conduct, determining whether such conduct meets the substantial certainty standard may present a jury question. Id.

Laidlow involved a worker who was injured while using a rolling mill machine in a lumber yard. Id., at 887. His employer had inactivated the safety guard on the machine, and only activated it when OSHA inspectors were on site. Id., at 896-97. Although there had been no prior similar injuries, there had been close calls and employees had complained of the unsafe condition. Id., at 897. Looking at the totality of the facts in that case, the New Jersey Supreme Court held

> that a reasonable jury could conclude, in light of all surrounding circumstances, including the prior close-calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent guard, and the guilty knowledge of [the employer] as revealed by its deliberate and systematic deception of OSHA, that [the employer] knew that it was substantially certain that the removal of the safety guard would result eventually in injury to one of its employees.

Id., at 897-98. Additionally, the Laidlow court found that "if Laidlow's allegations are proved, . . . . the context prong . . . would be met." Id., at 898. In reaching this conclusion, the court approvingly discussed an earlier appellate division case, Mabee v. Borden, Inc., 720 A.2d 342 (N.J. Super. Ct. App. Div. 1998), and stated that "[t]he court in Mabee also analyzed the context prong . . . and held that the deliberate removal of the safety device by the employer . . ., for profit and production motives, and in the face of a recent similar accident, was neither a fact of industrial employment nor a situation the Legislature could have contemplated as falling within the immunity of the Workers' Compensation Act." Id., at 895. Based on these findings, the Laidlow court reversed the grant of summary judgment in favor of the employer. Id., at 899.

A year after Laidlow, the New Jersey Supreme Court faced another case similar to Laidlow. In Mull, the plaintiff, a line operator at a plastic bag manufacturing facility, was injured when clearing out a jam in a machine. 823 A.2d at 783. She alleged: (1) that her employer disengaged the machine's critical safety devices, (2) that her employer knew of the dangerous consequences of such conduct, (3) that there had been a prior accident and that employees had expressed safety concerns, (4) that here had been prior OSHA citations, and (5) that her expert opined that the defendant's failure to provide appropriate lockout/tagout procedures made harm to defendant's employees predictable. Id., at 783-84. Like in Laidlow, the New Jersey Supreme Court in Mull held that "the foregoing facts, if proved, could result in a reasonable jury finding that defendant's conduct created 'substantial certainty' of injury." Id., at 786. The court also agreed that, for purposes of the summary judgment motion, the "plaintiff . . . ha[d] satisfied the context prong." Id. The court "echo[ed] Laidlow," stating that the Legislature would not have considered the facts as asserted by the plaintiff, if proven, as "constitut[ing] simple facts of industrial life." Id. (quoting Laidlow, 790 A.2d at 898). Thus, like in Laidlow, the Mull court reversed the prior grant of summary judgment in favor of the employer. Id.

C&C argues that for the WCA to not be a bar to Mr. Almanzar's claims,

> [t]he evidence would have to show that (1) C&C Metal Products directed plaintiff to not shut down the machine and use his hand to clean debris from in between the die-casting molds, (2) C&C Metal Products trained plaintiff to do the aforementioned hazardous conduct in order to increase productivity and (3) C&C Metal Products engaged in deceptive conduct to place plaintiff in a position that it knew was substantially certain to result in injury or death.

(Def. C&C's Reply Br. to Co-Def. MSC's Opp'n to Mot. for Summ. J. [hereinafter "C&C MSC Reply"], at 1.) C&C asserts that the evidence does not show these things. First, C&C asserts

that it did not bypass the safety mechanisms on the die casting machines. (See C&C Fact Stmt. ¶ 25.) Next, it argues that "[t]here is no evidence that [it] misled OSHA in any way." (C&C MSC Reply, at 1.) C&C states: "Unlike the defendant in Laidlow, [it] never disengaged safety guards in order to deceive OSHA or increase productivity." (Id., at 5.) C&C also argues that the prior accidents are a "red herring" because workplace accidents happen. (Id., at 2.) Finally, C&C argues that "[i]t is unfathomable to think that [Mr. Almanzar], in spite of the warning labels on the machine and the type of machinery he was operating, thought it prudent to place his hand in between the die-casting molds. (Id., at 4 (noting that "no amount of training can prevent human error").)

Contrary to C&C's assertions, Mr. Almanzar testified that he was specifically trained and instructed never to use the red stop button when cleaning the dies. He also testified that he was trained to clean the dies using a gloved hand and that long-handled brushes were not provided. Other employees' testimony is consistent with Mr. Almanzar's statements. He further testified that he was instructed to clean the dies in this manner in order to avoid production delays. If Mr. Almanzar's testimony is credited, a reasonable jury could conclude that the safety measures on the die casting machines were "essentially rendered ineffectual" by the training and demands of C&C. Laidlow, 790 A.2d at 895 (quoting Mabee, 720 A.2d at 349).

Additionally, contrary to C&C's assertions, OSHA *deception* is not an absolute requirement in these types of cases. As the Mull court held:

> Although the employer's purported deception in Laidlow was a prominent factor in our analysis, we emphasized in that case that no one fact compelled our holding. In that respect, we stated as guidance to future courts and litigants that "our disposition in such a case [involving removal of safety devices] will be grounded in the *totality of the facts* contained in the record[.]"

Mull, 823 A.2d at 786 (alteration and emphasis in original).  Here, it is undisputed that C&C received OSHA safety citations prior to Mr. Almanzar's accident and that those citations, although not directly related to the die cleaning process, were based on an evaluation of the entire plant and did deal with situations where C&C employees were inserting body parts into the machines for various reasons without using appropriate shut down procedures or other appropriate safety measures.

> The OSHA regulations provide:
>
> (2)(ii) Normal production operations are not covered by this standard . . . . *Servicing and/or maintenance which takes place during normal production operations is covered by this standard only if*;
> (A) An employee is required to remove or bypass a guard or other safety device; or
> (B) *An employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed* upon the material being processed (point of operation) or where an associated danger zone exists during a machine operating cycle.
> Note: Exception to paragraph (a)(2)(ii): Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, *provided that the work is performed using alternative measures which provide effective protection* . . . .

29 CFR 1910.147(c) (emphasis added).  These regulations plainly require special procedures when "[a]n employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed."  Minor servicing is exempted, but only "provided that the work is performed using alternative measures which provide effective protection."  C&C's prior citations were due to its failure to use appropriate lockout/tagout procedures when employees were required to insert their hands into the machines.  Although the citations may not have been specific to cleaning of the die casting machine, a jury could find that

they were similar in nature to the activity involved here and put C&C on notice of the hazards of such activities. Additionally, the evidence of prior accidents, most importantly an almost identical accident on the same machine, could support a finding that C&C knew that injury was substantially certain to occur if the cleaning process continued as explained by Mr. Almanzar, and that any such injury would be very serious.

Finally, with regard to training and what C&C characterizes as Mr. Almazar's failure to heed the warnings on the machine, C&C relies on Tomeo v. Thomas Whitesell Construction Company, 823 A.2d 769 (N.J. 2003).  But, C&C misapplies Tomeo to the facts of this case and misconstrues Mr. Almanzar's allegations.  C&C argues that Mr. Almanzar should have followed the instructions provided in the warnings on the machine and that nothing it did could have prevented Mr. Almanzar's "human error."  However, this is not what the Tomeo court held.  It held that "[n]o special training was required to be given [in that case] because [a snow blower] is a consumer product."  Tomeo, 823 A.2d at 776-77 ("[t]he snow blower is a consumer product rather than a piece of industrial production machinery.").  For consumer products, the court held that "[t]he warning labels adequately informed plaintiff not to put his hand into the chute while the propellers were operating."  Id.  The New Jersey Supreme Court found that there was no evidence of substantial certainty of injury under the facts of that case, which involved a "plaintiff [who] knew or should have known the propellers were operating before inserting his hand into the chute . . . not once, but two or three times."  Id., at 776.  Here, Mr. Almanzar was injured operating industrial machinery, not a consumer product, and it is undisputed that he heard the machine stop when he opened the sliding door before inserting his hand into the machine to clean the dies.  Additionally, Mr. Almanzar is not arguing that he was not trained or did not understand

that the warning signs indicated danger. He is arguing that he was trained in a specific way to clean the dies, which included being instructed to *never* use the red stop button, and that this training created a hazardous working situation. This Court finds that this case is similar to the fact scenarios in Laidlaw and Mull, not Tomeo.

For these reasons, this Court finds that a reasonable jury could find that the safety devices on the die casting machine were rendered essentially ineffectual by C&C's training and instructions to its employees and, that, through the prior OSHA citations and prior accidents, C&C knew of the dangerous condition and seriousness of the potential injury created when an employee was required to insert his hand into the die casting area without the machine being appropriately shut down. Additionally, a reasonable jury could credit the opinion of Mr. Almanzar's expert, Ms. Hopkins, that his accident was caused by C&C's systematic disregard of OSHA safety regulations. Also, like in Laidlow and Mull, this Court finds that these facts, if proven, would satisfy the context prong. Therefore, C&C's motion for summary judgment is denied.

## VI. MSC'S MOTION FOR SUMMARY JUDGMENT

Mr. Almanzar brings claims specifically against MSC for negligence. (See Am. Compl. ¶ 50.) MSC argues that an evaluation of its alleged negligence in servicing Machine #12 is not a matter for lay opinion, that expert opinion is required. (MSC Br., at 3.) It further argues that the report of Mr. Almanar's expert, Ms. Hopkins, is a "net opinion" that should be disregarded. (Id.) Thus, MSC argues that there is no competent evidence of its negligence in servicing Machine #12.

In New Jersey, "[t]he [net opinion] rule requires the expert to give the why and wherefore

of his or her opinion, rather than a mere conclusion." State v. McNeil, 963 A.2d 358, 364 (N.J. Super. Ct. App. Div. 2009) (internal quotations omitted). A net opinion is inadmissible. Id. MSC argues that "Ms. Hopkins does not offer any quantitative electrical engineering analysis to explain the failure or cycling of the machine or switch." (MSC Br., at 5.) Mr. Almanzar counters that, even if Ms. Hopkins's opinion is not sufficient to meet his evidentiary burden, there is other sufficient evidence in the record demonstrating the cause of Machine #12's failure and MSC's role in servicing the machine. First, Mr. Almanzar points to the report of C&C's expert, Mr. Dreyer, a Professional Engineer with National Forensic Consultants, Inc., who inspected Machine #12. (See Thomas Cert. Ex. W., Supplemental Report of Paul L. Dreyer, P.E.) Mr. Dreyer opined that "the incident occurred due to an unexpected malfunction of the safety guard limit switch assembly allowing the machine to remaining running when it should have stopped." (Id., at 6.) He further stated that "[a] similar limit switch malfunction apparently occurred about six years prior to the subject incident on the same machine." (Id.) Mr. Almanzar also points to the opinion of MSC's own electrician, Mr. Frohlich who diagnosed Machine #12 as "need[ing] to be completely rewired" because it was a "Big Mess." (Id., at Ex. AA, MSC Service Record.) The Court finds that such evidence is sufficient to create a genuine issue of material fact as to the cause of Machine #12's malfunction.

   The court also finds that there is sufficient evidence in the record to support a finding that MSC serviced Machine #12 both after Mr. Amaro's accident in 2000 and in the months leading up to Mr. Almanzar's accident. MSC asserts that "[t]here is no evidence that [it] was aware of [the 2000] incident or made repairs to the machine at that time." (MSC Br., at 5.) But, C&C asserts that it was MSC who serviced the machine in 2000 and other evidence in the record, such

as Mr. Simchera's testimony that MSC was servicing machines at C&C as early as 1999, could support a finding that MSC was the company who serviced Machine #12 in 2000. With respect to the service calls in 2006, MSC states that the calls were not repairs. Viewing the evidence in the light most favorable to Mr. Almanzar, a reasonable jury could conclude that MSC serviced and/or repaired Machine #12 in the months leading up to Mr. Almanzar's accident. The evidence shows that MSC was on site servicing various machines on a regular basis in the months leading up to the accident. The service records indicate that some of the work pertained to limit switches. Mr. Simchera, MSC's service technician, testified that although his notes were vague, some of the servicing could have been performed on Machine #12. Plus, Mr. Almanzar testified that Machine #12 was breaking down and repaired on numerous occasions in this period in-house as well as by MSC. This is sufficient to create a genuine issue of material fact as to MSC's servicing of Machine #12. Finally, the evidence could support a finding that MSC sent an unlicensed electrician to fix the machine, that the serviceman was unable to determine the cause of the 2000 malfunction, and yet, MSC continued to send the unlicensed serviceman for subsequent repairs. Once MSC sent a technician with an electrical engineering degree, Mr. Frohlich, it was able to determine that Machine #12 was a mess and needed to be rewired.

Based on the foregoing, this Court finds that a genuine issue of material fact exists as to whether MSC was negligent in the servicing of Machine #12 and whether such neglience contributed to Mr. Almanzar's injuries. Because this Court finds that a genuine issue of material fact exists as to MSC's negligence based on the affirmative evidence in the record, it does not reach Mr. Almanzar's alternate argument that res ipsa loquitor applies in this case. MSC's motion for summary judgment is denied.

**VII.    CONCLUSION**

For the foregoing reasons, Racine's motion is granted, Avnet's motion is granted, C&C's motion is denied, and MSC's motion is denied.  An appropriate Order accompanies this Opinion.


DATED: March 31, 2010            /s/ Jose L. Linares
                                 UNITED STATES DISTRICT JUDGE