7130-J
MARTIN, GUNN & MARTIN, P.A.
216 Haddon Avenue, Suite 420
Westmont, New Jersey 08108
(856) 858-0900
William J. Martin, Esquire (9364)
Attorneys for Defendant, C&C Metal Products, Inc.

| | |
|---|---|
| SANDY ALMANZAR,<br><br>                      Plaintiff,<br>v.<br><br>C&C METAL PRODUCTS, INC.,<br>HONEYWELL INTERNATIONAL, INC., and<br>RACINE FEDERATED, INC., as Successor to<br>AVNET, INC.,<br>                      Defendants. | : UNITED STATES DISTRICT<br>: COURT FOR THE DISTRICT<br>: OF NEW JERSEY<br>:<br>:     CIVIL ACTION NO.<br>:<br>:     2:07-cv-4002-(JLL)(CCC)<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

---

## DEFENDANT C&C METAL PRODUCT'S MOTION TO DISMISS ANY AND ALL CLAIMS FOR PUNITIVE DAMAGES

---

                                      MARTIN, GUNN & MARTIN, P.A.
                                      216 Haddon Avenue, Suite 420
                                      Westmont, New Jersey 08052
                                      (T) 856-858-0900
                                      (F) 856-858-1278
                                      wmartin@martingunn.com
                                      Attorneys for Defendant, C&C Metal
                                      Products, Inc.
                                      William J. Martin, Esquire

On the Brief:
Todd M. Parisi, Esquire

## PRELIMINARY STATEMENT

Defendant, C&C Metal Products, Inc., previously moved for summary judgment as to compensatory damages, which was denied by the Court on March 31, 2010. The instant application for summary judgment addresses plaintiff's claim for punitive damages only.

## STATEMENT OF MATERIAL FACTS PURSUANT TO L. Civ. R. 56.1

1. The present matter arises out of the April 10, 2006 workplace accident of plaintiff Sandy Almanzar while he was employed by defendant/movant C&C Metal Products, Inc. (hereinafter "C&C").

2. As a result of the workplace accident, plaintiff filed the instant action against various defendants including C&C Metal Products, Inc., plaintiff's employer. Plaintiff's allegations against his employer were that its conduct constituted a "substantial certainty" of injury to plaintiff thereby falling within the exception to the exclusive remedy provision of the Workers' Compensation Act, N.J.S.A. 34:15-8. See Laidlow v. Hariton Machinery Company, Inc., 790 A.2d 884 (N.J. 2002).

3. Plaintiff was a die casting machine operator for C&C at the time of his accident. C&C manufactures items such as belt buckles and buttons through a molten zinc die casting process.

4. The die casting machine involved in plaintiff's accident operates by hydraulically pressing together two "dies" which have the shape of a part molded onto them. Once the dies are "closed" or together, hot molten zinc is injected into the mold. The dies are then retracted and a completed zinc part drops from the dies.

5. Plaintiff began to learn how to operate the die casting machines at C&C. He was trained by his supervisor, Armando Haro, on the machine's startup, setup and operation. (See Deposition Transcript of Plaintiff at pg. 23 lines 8-20 attached hereto as Exhibit "A").

6. The die casting machines at C&C have a sliding door on the front of it that allows the operator to access the area of the dies. The door has a "limit" switch on it which stops the machine's cycle when it is open. (See photographs attached hereto as Exhibit "B").

7. The die casting machines have an electrical control panel with a series of lights and switches on it. The switches control the various functions of the machine. One of the buttons is a red stop button which turns off power to the machine. It is larger than the other buttons on the panel. (See photographs, attached hereto as Exhibit "C").

8. Plaintiff testified that he would not press the red emergency stop button before putting his hand between the dies, but would instead rely on the limit switch on the yellow door to stop the cycle of the machine. (Exhibit "A" pg 43 lines 21-24).

9. Plaintiff also testified that the use of the red button to shut off the machine makes a routine stoppage of the cycle "a bigger job" because he would then have to turn off the water and the heat as well. (Exhibit "A" pg. 53 line 19 to pg. 54 line 1).

10. By relying on the limit switch on the yellow door to the machine, plaintiff testified that, "There is no way that I could have my hands inside the machine when the machine is on because the door would have to be closed. There is no

way I would have my hands inside when it's operating." (Exhibit "A" pg. 51, lines 4-8)

11. On the day of plaintiff's accident, he was responsible for the operation of five die casting machines. Machine number twelve's parts were coming out defective and plaintiff stopped the machine by sliding open the yellow door with his right hand and placed his left hand in the machine. (Exhibit "A" pg. 66, line 21 to pg 67 line 1).

12. Plaintiff did not utilize the red button to stop the machine at this time. (Exhibit "A" pg 68, lines 20-23).

13. Plaintiff heard the hydraulic pump stop when he opened the yellow door prior to placing his hand in the machine. (Exhibit "A", pg. 70, lines 1-4).

14. After he placed his hand between the dies he then heard the hydraulic pump unexpectedly restart and the dies came together on his hand. (Exhibit "A" pg. 70 line 4 to page 71, line 2).

15. In 2000, six years prior to plaintiff's accident, a similar accident occurred to Guadaloupe Amaro. Mr Amaro's hand was caught between the dies of machine number twelve. Mr. Amaro told Armando Haro that at the time of his accident that he too failed to use the red emergency stop button before placing his hand in the machine. (Exhibit "D" page 44 line 4, to page 47, line 18).

16. Twelve years prior to the plaintiff's accident and six years before the Amaro accident, another C&C employee, Luis Santiago was involved in an accident with a different die casting machine in which his right hand was injured. It is unknown specifically how this accident occurred.

17. In 1997 C&C had an OSHA violation regarding the use of "lock out tag out" procedures at its plant. OSHA cited C&C for two separate items on two separate machines. It cited C&C for not utilizing proper "group lock out" procedures when 2 or more employees were performing work on the die casting machine. This was found to be a violation of 29 CFR 1910.147(c)(4). It also found that employees were not using any lock out tag out procedures on a "four slide" wire forming machine, which is a different machine than the one involved in this case. (See Exhibit "E").

18. Lock out/tag out procedures are a process in which the power supply to a piece of equipment is turned off and the switch "locked" so that the machine cannot be re-energized accidentally. When C&C was cited in 1997, it was because two employees were changing dies on the machine and the supervisor had been the only one to lock out the machine. The OSHA report states that C&C "was aware that the employees were performing lockout by allowing the supervisor to lockout the machines for groups of workers…" and that C&C "thought this practice was sufficient to protect the workers." (See Exhibit "E").

19. Lockout/tag out procedures are not required for "minor tool changes and adjustments and other servicing activities that take place during normal production operations." (Exhibit "F", 29 CFR 1910.147 (a)(2)(ii)(B)).

20. Defendant C&C Metal Products, Inc. made an application to the Court requesting summary judgment pursuant to Rule 59(c) of the Federal Rules of Civil Procedure under Laidlow, supra.

21. By Order dated March 31, 2010, the Court denied the employer's motion for summary judgment on the grounds that "a reasonable jury could find that the safety devices on the die casting machine were rendered essentially ineffectual by C&C's training and instructions to its employees and, that, through the prior OSHA citations and prior accidents, C&C knew of the dangerous condition and seriousness of the potential injury created when an employee was required to insert his hand into the die-casting area without the machine being appropriately shut down. (See Order and Opinion dated March 31, 2010 at pp. 13-15, attached hereto as Exhibit "G").

22. The Court found that a reasonable jury could credit the opinion of Mr. Almanzar's expert, Ms. Hopkins, that his accident was caused by C&C's systematic disregard of OSHA safety regulations. (Id.).

23. The Court also found, like in Laidlow and Mull, this Court finds that these facts, if proven, would satisfy the "context prong." (Id. at p. 15).

24. The Court based its decision on plaintiff's testimony that he was trained to never use the stop button when cleaning the dies; he was trained to clean the dies using a gloved hand and that long-handled brushes were not provided; and he was instructed to clean the dies in this manner in order to avoid production delays. (Id. at 12).

25. The Court also noted that C&C received OSHA citations prior to plaintiff's accident, and although not directly related, were based on an evaluation of the entire plant and did deal with situations where C&C employees were inserting

        body parts into the machines for various reasons without using appropriate shut down procedures or other safety measures. (Id. at p. 13).

26.    The evidence of a prior accident that was almost identical to plaintiff's accident, the Court commented, "could support a finding that C&C knew that injury was 'substantially certain' to occur." (Id. at p. 14).

    Defendant, C&C Metal Products, Inc., now moves for summary judgment based on the grounds that plaintiff is unable to support a claim for punitive damages based upon the evidence in this matter.


## LEGAL ARGUMENT

### PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES BASED ON CIRCUMSTANTIAL EVIDENCE TO SUPPORT A CLAIM UNDER *LAIDLOW v. HARITON MACHINERY CO.*

The New Jersey Supreme Court has held that the New Jersey Workers Compensation Act ("WCA") "provides the exclusive remedy for claims against an employer when a worker is injured on the job, except for those injuries that have resulted from the employer's 'intentional wrong.'" Mull v. Zeta Consumer Prods., 823 A.2d 782, 783 (N.J. 2003)(citing N.J.S.A. 34:15-8). The WCA provides:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

N.J.S.A. 34:15-8. The seminal case involving the "intentional wrong" exception to the worker's compensation act bar to a claim by an employee is Millison v. E.I. du Pont de Nemours & Co., 501 A.2d 505, 512 (N.J. 1985), wherein the Court held that a plaintiff can prove an "intentional wrong" in two ways: 1) evidence of subjective intent to harm the employee; and 2) evidence that the conduct of the employer gave rise to a "substantial certainty" of harm to an employee. Id.

In Laidlow v. Hariton Machinery Company, Inc., 790 A.2d 884 (N.J. 2002), the New Jersey Supreme Court revisited the "substantial certainty" method of establishing an exception to the worker's compensation act bar to a claim by an employee. In Laidlow, the Supreme Court explained that it had rejected Professor Larson's deliberate intent to injure standard in Millison in favor of Dean Prosser's alternative "substantial certainty" standard, as an alternative by which a plaintiff may prove an intentional wrong as defined

in the WCA. The <u>Laidlow</u> Court explained that proof of "substantial certainty" as follows:

> It may help to perceive "substantial certainty" not so much as a substantive test itself nor as a substitute for a subjective desire to injure, [than] as a specie of evidence that will satisfy the requirement of cases such as <u>Bryan v. Jeffers</u>, <u>supra</u>, 103 <u>N.J. Super.</u> at 523-24, that "deliberate intention" be shown. [<u>Ibid.</u>]

According to <u>Laidlow</u>, <u>Millison</u> allowed for two methods of proof for an intentional wrong to avoid the Workers' Compensation Act bar--- 1) subjective desire to injure and 2) the substantial certainty standard, the latter of which does not actually involve the employer's intent to cause the injury but instead is sufficient proof to avoid the bar. The <u>Laidlow</u> Court further explained the <u>Millison</u> decision as follows:

> Recapping, a number of principles relevant to the present inquiry can be distilled from <u>Millison</u>. First, although we recognized the need for a chary interpretation of the intentional wrong exception to the Workers' Compensation bar so that the exception would not "swallow up" the rule, we clearly rejected Larson's narrow and limited approach that required subjective intention to injure. <u>Id.</u> at 177. Second, in rejecting that approach, we also declined to adopt Larson's conclusion concerning the effect of removal of a safety device. At the very least, that issue remained open after <u>Millison</u>.
>
> Third, <u>we adopted Prosser's substantial certainty test for intentional wrong, a test encompassing acts that the employer knows are substantially certain to produce injury **even though, strictly speaking, the employer does not will that result.**</u> Fourth, although we did not repudiate <u>Bryan</u>, <u>Ashland</u> and <u>Arcell</u> outright, our adoption of the "substantial certainty" standard as a complement to the "subjective desire" standard governing conduct plainly modified that line of cases. Fifth, under <u>Millison</u>, in order for an employer's act to lose the cloak of immunity of <u>N.J.S.A.</u> 34:15-8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

<u>Laidlow</u>, 790 A.2d at 894. (emphasis added).

In <u>Charles Beseler Co. v. O'Gorman & Young, Inc.</u>, 911 A.2d 47, 49 (N.J. 2006), the Supreme Court further explained the WCA "intentional wrong" exception, in the context of a claim that an exclusion in an insurance policy barred insurance coverage under the Workers' Compensation/Employer's Liability policy for a <u>Laidlow</u> claim. In <u>Beseler</u>, the policy contained a C5 Exclusion, barring coverage for bodily injuries "intentionally caused or aggravated by" the employer. The <u>Beseler</u> Court again explained the historical trade off between the WCA and common law remedies, and that the intentional wrong exception can be proven by two distinct methods: 1) evidence of a subjective desire to harm, or 2) under the "substantial certainty" standard.

> We have described the workers' compensation system "as an historic 'trade-off' whereby employees relinquish their right to pursue common-law remedies in exchange for prompt and automatic entitlement to benefits for work-related injuries." That system, however, is not without exception. When a worker's injuries have been caused by an employer's "intentional wrong," that "intentional wrong" voids the "trade-off" and the employee may seek both workers' compensation benefits and common-law remedies. <u>N.J.S.A.</u> 34:15-8.
>
> The test for "intentional wrong" has evolved. In <u>Millison</u>, <u>supra</u> we defined "intentional wrong" as an action, committed with deliberate intent, that had a "substantial certainty" of causing injury. In <u>Laidlow</u>, supra we clarified that an "intentional wrong" included "actions taken with a subjective desire to harm" as well as "instances where an employer knows that the consequences of those acts are substantially certain to result in such harm."

<u>Beseler</u>, 911 A.2d at 49 (quoting <u>Laidlow v. Hariton Mach. Co., Inc.</u>, 790 A.2d 884, 886-87 (N.J. 2002); <u>Millison v. E.I. du Pont de Nemours & Co.</u> 501 A.2d 505, 512 (N.J. 1985); <u>N.J.S.A.</u> 34:15-7 to -8).

The <u>Beseler</u> Court then held that the C5 exclusion only applied to a claim involving a subjective desire to harm, and not the alternative method of proof of substantial certainty discussed in <u>Laidlow</u>:

> The policy language does not unambiguously exclude injuries falling under the "substantially certain" prong of the intentional-wrong exception recognized by Laidlow.
>
> The C.5 exclusion precludes coverage for bodily injuries "intentionally caused or aggravated by" the employer. That language clearly excludes only injuries that result from a subjective intent to injure. However, once Laidlow was decided, it became clear that there are alternative methods of proving an intentional wrong and avoiding the exclusivity of the workers' compensation remedy. The substantial-certainty method of proof is distinct, but also will demonstrate an "intentional wrong." C.5.'s language does not unambiguously exclude such claims from coverage.

The Appellate Division in Beseler acknowledged the difference between the subjective and deliberate intent to injure and the "substantial certainty" of injury as defined in Laidlow, supra. See Beseler Co. v. O'Gorman & Young, 881 A.2d 770 (N.J. Super. Ct. App. Div. 2005) *aff'd* 911 A.2d 47 (N.J. 2006). In Beseler, the Appellate Division noted:

> It has been suggested by plaintiff that *Schmidt* overruled *Joseph Oat* and that *N.J.S.A.* 34:15-71, -72 and -78 mandate coverage "for all occupational injuries" irrespective of intent to injure. *See also Garrity, supra,* 104 N.J.L.J. at 532. We need not go so far, **but conclude that the policy in this case excludes only injuries intentionally caused, and not the type of act alleged in this case--an unintended injury caused by an intentional wrong**. In light of *Schmidt* and the fact exclusions in insurance policies are subject to "strict interpretation," *Butler v. Bonner & Barnewall, Inc.*, 56 N.J. 567, 576, 267 A.2d 527 (1970), we find no exclusion of the type of conduct alleged in this case which was the type of wrongdoing for which a common-law cause of action was recently sustained in *Laidlow. Schmidt* specifically addressed the "reasonable expectations" of the insured in the context of exclusion C7; the same reasoning applies here. Comparatively little would be covered under Part Two if the C5 exclusion and the concept of "intentional wrong" are as broad and the "gap" as little, for coverage purposes, as NJM contends. In any event, exclusion C5 cannot be read to exclude bodily injuries based on the conduct alleged in this case. *See President v. Jenkins*, 180 N.J. 550, 563, 853 A.2d 247 (2004) ("[w]hen an insurance policy's language fairly supports two meanings, one that favors the insurer, and the other that favors the insured, the policy should be construed to sustain coverage").
>
> **We do not deal with an alleged act designed to purposely injure the**

> **employee, coverage for which would offend public policy**. Further, in light of *Schmidt,* the fact *Joseph Oat* rejected any distinctions between "subjective intent and substantial certainty of harm," *Joseph Oat Corp., supra,* 287 N.J. Super. at 197, 670 A.2d 1071, must be deemed outdated in this case involving bodily injury.
>
> We decide only that the underlying complaint does not allege an intent to injure and that this policy, consistent with statutory and case law authority, does not exclude coverage for intentional acts which are not themselves intended to cause injury.

Beseler Co., 881 A.2d at 775-76. (emphasis added).

It is unequivocal that Courts are aware of the clear distinction between injuries that are a result of a subjective intent to harm and those which are a result of an unintentional act that is "substantially certain" to result in an injury. The trilogy of cases discussing the standard set forth in Millision, supra. and further explained in Laidlow, supra. are all clear in their analysis as not finding that the employer's actions were subjectively intended to cause harm to the plaintiff, but rather that such conduct was a "substantial certainty" of injury to the plaintiff. See infra.

In Crippen v. Central Jersey Concrete Pipe Co., 823 A.2d 789, 793-94 (N.J. 2003), the Court concluded that Mr. Crippen's death resulted not from the defendant not being aware of some hazardous and dangerous conditions on this site, but from their deliberate, intentional decision not to address the violations cited by OSHA and identified as "Serious." Their efforts were directed toward reducing the penalties and keeping OSHA away so they did not incur any further penalties, rather than making the plant safe and inviting OSHA back to assist them in moving toward a safe environment for their employees.

In Tomeo v. Thomas Whiteshell Constr. Co. Inc., 823 A.2d 769 (N.J. 2003), the plaintiff was injured while operating a snow blower for his employer. The snow blower

machine was equipped with a gear shift lever on one side of what is described as a handle-bar. On the other side was a safety lever that activates the propellers when squeezed and deactivates them when released. At the time of the accident, the safety lever had been taped in the operational position with electrical tape. Id. at 769-70. The Tomeo Court, even acknowledging that the defendant employer may have disengaged the safety lever on the snow blower, held that such conduct was not enough to overcome the Millison-Laidlow standard and permit a claim against the employer.

Finally, in Mull v. Zeta Consumer Products, 823 A.2d 782 (N.J. 2003), the plaintiff was employed as a line operator at its plastic-bag manufacturing facility. One of plaintiff's duties required that she work with a machine known as a "winder," which winds plastic bags onto spools for packaging and delivery. Nylon ropes turn the machine's cylinders. Plastic frequently jammed the machine, sometimes causing the nylon ropes to break. Whenever that occurred, the employer required the line operator to clear the jam and replace the broken ropes, if any. Mull, supra at 783.

The plaintiff was operating the winder when it became jammed. Plaintiff turned off the machine by pressing the red stop button on the control panel. She then lifted a fiberglass guard, removed the lodged plastic, and began to replace the broken ropes. Suddenly, the winder began to operate, pulling plaintiff's left hand into the machine. Plaintiff sustained serious injuries, including amputation of her left pinky and ring fingers. Id. at 783-84.

As a result of the incident, OSHA cited defendant for various safety violations. Several months before the incident, OSHA had cited defendant for failing to provide its employees with so-called lockout/tagout procedures. Id. Also, prior to the date of

plaintiff's injuries, another line operator, Edin Hasanovic, had been injured when his hand was pulled into the winder, although that prior incident did not occur in exactly the same fashion as had plaintiff's incident. Hasanovic stated that "[o]perators complained all the time about safety but nothing seemed to be done." Id.

The Mull Court relied upon evidence of prior accidents and "close-calls" coupled with prior OSHA violations and a blatant disregard to correct same to circumvent the Workers' Compensation Act bar, and permit a cause of action against the employer under the "intentional wrong" exception, but did not opine that the employer actually intended to injure the plaintiff.

As can be seen from the above cases, the "substantial certainty" standard for proving an intentional wrong does not involve proof of actual willful conduct on the part of the employer, an evil-minded act, or evidence of willful or wanton conduct. Plaintiff has sought to circumvent the WCA exclusive remedy in this case solely by claiming that defendant's conduct meets the "substantial certainty" test, and he has not even alleged a claim of subjective intent to harm. Plaintiff, who seeks to prove an intentional wrong under the "substantial certainty" test, cannot establish a claim for punitive damages. The aforementioned cases have discussed the standard for circumvention of the WCA wherein the injury resulted not from an act of intended harm, but from conduct by the employer which equates to an intentional wrong not actually intended to cause injury. However, the Courts have not held nor even addressed that such conduct gives rise to punitive damages. Such a decision would be in direct contravention to the New Jersey's Punitive Damages Act, N.J.S.A. 2A:15-5.12. Plaintiff in this case has proffered no evidence to meet the strict requirements of the Punitive Damages Act. See infra.

N.J.S.A. 2A:15-5.12, provides that, to justify an award of punitive damages, a plaintiff must prove by "clear and convincing evidence" that the defendant was guilty of actual malice or a wanton and willful disregard of the foreseeable harm that likely would be caused by the defendant's wrongful acts or omissions. In pertinent part, the Punitive Damages Act states:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. 2A:15-5.12(a). In determining whether punitive damages are to be awarded, the Act instructs that the trier of fact should consider the following factors: "(1) the likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) the defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) the conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of it by the defendant." Id. at (b).

N.J.S.A. 2A:15-5.10 defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act." Section 15-5.12 further defines "wanton and willful disregard" as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." Id.

As the Third Circuit has explained, to prove "wanton and willful misconduct",

> [i]t must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably

result from his conduct, and with reckless indifference to the consequences, **consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result**.

Kane v. U-Haul Int'l, Inc., 218 Fed. Appx. 163, 167 (3d Cir. 2007) (citing McLaughlin v. Rova Farms, Inc., 266 A.2d 284, 293 (N.J. 1970)). The Punitive Damages Act itself specifies that "proof of any degree of negligence including gross negligence" is not enough to justify an award of punitive damages. N.J.S.A. 2A:15-5.12(a).

The standard for proving the intentional wrong exception to the Act by way of substantial certainty, as compared to subjective intent to harm, does not rise to the level of proof for punitive damages under the Punitive Damages Act. There is no allegation of an evil-minded act. Further, there is no willful and wanton conduct as it is defined under the Punitive Damages Act. There is no evidence that the defendant "consciously and intentionally" did some wrongful act or omission. Simply put, as the Court noted in Laidlow, supra., there is no actual intent in a substantial certainty case even though such a case meets the intentional wrong exception to the Workers' Compensation Act. Laidlow, 790 A.2d at 884 ("we adopted Prosser's substantial certainty test for intentional wrong, a test encompassing acts that the employer knows are substantially certain to produce injury even though, strictly speaking, the employer does not will that result.").

To permit punitive damages in the instant matter would be contrary to public policy as it would be duplicative of the Legislative intent of the Punitive Damages Act. The Act was created on a theory of punishment and to deter such conduct from happening in the future. See Smith v. Whitaker, 734 A.2d 243 (N.J. 1999). In cases such as this one, the punishment to the employer is to take away the protective cloak of the Workers' Compensation Act and permit the plaintiff to recover both in tort and workers'

compensation benefits against the employer for his injuries. To allow an award of punitive damages in addition to removing the immunity afforded under the Act would be inconsistent with the Legislative purpose of the Workers' Compensation Act.

There is no evidence to support plaintiff's claims for punitive damages in the instant matter. The Court, in denying defendant C&C Metal Products, Inc.'s motion for summary judgment, relied upon evidence that the plaintiff was trained not to use the stop button to perform routine cleaning on the die-casting machine, was aware of prior OSHA violations that were unrelated to the die-casting machine and another employee was injured in substantially the same manner prior to plaintiff's accident. The Court never indicated that a jury could find that the employer intended to injure the plaintiff. An employer, no matter how negligent or reckless never intends for his employees to be injured. It is the lack of such intent that makes an award of punitive damages unwarranted under these circumstances.

For the foregoing reasons, defendant/employer, C&C Metal Products, Inc., respectfully requests that the Court dismiss any and all claims for punitive damages with prejudice.

## **CONCLUSION**

For the foregoing reasons, defendant C&C Metal Products, Inc., respectfully requests that the instant application dismissing any and all claims for punitive damages against it with prejudice.

                                                Respectfully submitted,

                                                MARTIN, GUNN & MARTIN, P.A.
                                                Attorneys for defendant, C&C Metal
                                                Products, Inc.

                                                By:   /s/ William J. Martin
                                                           WILLIAM J. MARTIN

Dated: June 11, 2010